**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

UNITED STATES OF AMERICA

v.                                    Case No. 3:07-cr-131-J-32HTS

ENCARNACION BAEZ
   a/k/a Shaun

_____

**REPORT AND RECOMMENDATION**[1]

**I.  Status**

    This cause is before the Court on Defendant Encarnacion Baez'
Amended Motion to Suppress (Doc. #36; Motion), filed on July 19,
2007.  The government filed opposition in response to the Motion on
August 3, 2007.  *See* United States' Response in Opposition to
Defendant Encarnacion Baez' Amended Motion to Suppress (Doc. #45).
An evidentiary hearing was held before the undersigned on August
15, 2007.

---

   [1]    Specific, written objections may be filed in accordance with 28
U.S.C. § 636 and Rule 6.02, Local Rules, United States District Court, Middle
District of Florida, within ten (10) days after service of this document.
Failure to file timely objections shall bar the party from a *de novo*
determination by a district judge and from attacking factual findings on appeal.

## II. Testimony

Wayne Andrews gave the only testimony presented at the hearing.  Mr. Andrews is employed as a special agent for the Drug Enforcement Administration.  He has worked in that capacity for about sixteen years.

In April of 2007, a cooperating individual, Donald Dampier, stated a man named Randall Sitz was operating as a marijuana dealer.  Mr. Dampier had allegedly assisted for a year and a half to two years in various aspects of Mr. Sitz's drug business, including distribution, and he was able to take investigators to Mr. Sitz's residence.  He further indicated two Mexican males, one whom he knew by the name of Shaun, would come from Arizona on a monthly basis, bringing the drugs in a sealed compartment within the bed of a white Toyota Tacoma pickup.  On one occasion, Mr. Dampier had helped Mr. Sitz and another person unload the marijuana, a procedure which required removing the bed from the truck.  Additional details were provided by this cooperating individual, including his knowledge of historical departure and arrival times of the pickup, motel accommodations for various participants, and arrangements for the return of drug proceeds to Arizona.

Investigators were already aware that Randall Sitz was a major marijuana distributor for an Arizona-based organization.  Noe Becerra and Frank Marquez, two individuals involved in that

- 2 -

enterprise, had been prosecuted and had cooperated with law enforcement as part of their plea agreements. They had identified Randall Sitz initially as a distributor, but ultimately as a person to whom "they turned their source of supply over to . . . to continue the distribution in the area." Transcript of Suppression Hearing (Tr.), filed on August 21, 2007, at 17.

On April 28, 2007, Mr. Dampier notified Agent Andrews that Mr. Sitz had called him indicating "he was ready to do business[,]" meaning another load of drugs had arrived. *Id.* at 18. The following day, Mr. Andrews confronted Randall Sitz and secured his cooperation. Mr. Sitz agreed to a search of his house, which yielded over two hundred and fifty pounds of marijuana. A white Toyota Tacoma pickup registered to Carlos Carbajal was discovered in the garage. Its bed had been modified to create a concealed compartment, and the drug "bricks" recovered "were all uniform so that they would fit inside of this truck[.]" *Id.* at 19, 79. They were "slightly smaller than the dimensions o[f] the truck." *Id.* at 80. Mr. Dampier had "described the vehicle to a T, talked about how many bolts were in the front that concealed the concealed compartment [and] all the specifics on how they had to get it out and recover [the drugs] with like a [g]aff hook . . . ." *Id.* at 87. The garage contained materials useful for distributing drugs, a specially molded gaff hook, and a hydraulic lift that could be

employed to remove the bed from the truck.  At the time of the search, the truck smelled of marijuana.

According to Mr. Sitz, for the last couple of years the pickup would arrive on generally a monthly basis.  He identified the primary individual involved as Shaun, which he explained was short for Encarnacion.  All the marijuana recovered in the search of the house had been received from Shaun.  Mr. Sitz indicated Shaun had stayed at a particular motel on his last trip, his arrival having occurred the prior Wednesday, and that he (Mr. Sitz) had dropped him off at the location.

Investigators obtained a copy of a driver's license in the name of Encarnacion Baez left at the motel around that time, and Mr. Sitz was able to identify the photograph thereon as depicting the person he knew as Shaun (hereinafter Mr. Baez or Defendant). When dropping him off at the motel, Mr. Sitz saw Defendant meet with an individual he had seen on other occasions, "the person who drives the loads from Arizona to Florida."  *Id.* at 24.  This person, whom he assumed was the "mule," was "in posture about the same size as Mr. Encarnacion Baez[, but] somewhat heavier set and walked with a limp."  *Id.* at 29.

Mr. Sitz explained that the loads would arrive in Gainesville, Florida, and the driver would be met by Mr. Baez, who would then take the truck to Mr. Sitz's residence, separate the bed from the truck, and remove the drugs from the concealed compartment.  As the

- 4 -

operation evolved, the truck would be left at his house until a good deal of money had accumulated—the money would then be stashed in the hidden compartment and the pickup returned to Arizona. Amounts under approximately $30,000.00 were considered small enough to transport by air.  Travel and accommodation habits were also revealed by Mr. Sitz and were consistent with the descriptions of Mr. Dampier.

Mr. Sitz indicated Defendant was to arrive in Florida on May 7, 2007.  On that date, he notified agents Mr. Baez had in fact arrived, was using a small white Chevrolet automobile (believed to be a Cobalt), and was staying at a Comfort Inn.  Additionally, Mr. Sitz revealed Defendant had said he needed to purchase some items from Wal-Mart.  After Mr. Baez met with him at his residence, Mr. Sitz indicated Defendant was to see him again the next evening.

Surveillance of Defendant was instituted.  He was observed driving a white Chevrolet Cobalt to a Comfort Inn in Gainesville. Investigators also tailed Mr. Baez and another person into a Wal-Mart store.  The other individual was heavier than Defendant and ambled with a perceptible limp.  On the evening of May 8, 2007, Mr. Baez was observed visiting the area of Mr. Sitz's residence.  After spending thirty to forty minutes there, Defendant was observed by law enforcement officers returning to the Comfort Inn.  Mr. Sitz reported he had, per law enforcement instructions, asked Mr. Baez for another day "to get the money together." *Id.* at 48.

On May 9, 2007, Mr. Sitz was sent to pick up Defendant and bring him back to his house, where Mr. Andrews and a task force officer would be waiting.  The officers approached the men upon their arrival and instructed them to have a seat in the gazebo located near the door to the house.  To maintain the potential for using Mr. Sitz further, he was "arrested" along with Defendant.

Ultimately, it was discovered through Mr. Sitz "that Mr. Dampier was a larger distributor than" he had led agents to believe.  *Id.* at 67.  Mr. Sitz described seeing Mr. Dampier with a large sum of currency that he kept buried on his property in a PVC pipe.  Mr. Dampier initially denied that he possessed such funds. During a search of his property that took place on May 14, 2007, Mr. Dampier at first was less than cooperative with assisting officers in recovering this money, which he maintained was in part an inheritance from his mother.  Eventually, he agreed to divulge its location if he were permitted to use a small portion ($10,000.00 of what was later determined to be $280,950.00) to compensate his attorney.

### III.  Summary of Argument

Defendant asks the Court to suppress evidence seized "as a result of . . . inaudible recordings, including any statements made[.]"  Motion at 1.  At the hearing, defense counsel stated the admissibility of the recordings is not actually being challenged at this stage.  Rather, the only argument is that Mr. Baez's

- 6 -

warrantless arrest was unsupported by probable cause.  Defendant does not claim *Miranda* rights were improperly read to him, and he does not challenge the voluntary, knowing waiver of those rights.

## IV.  Analysis

Where there is probable cause to believe an individual has committed a felony, a police officer is justified in making a warrantless arrest. *See United States v. Santa,* 236 F.3d 662, 676 n.20 (11th Cir. 2000) (citing *United States v. Watson*, 423 U.S. 411, 423-24 (1976)).  Probable cause exists "when the facts and circumstances within the officer's knowledge, of which he or she has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *United States v. Lyons,* 403 F.3d 1248, 1253 (11th Cir. 2005) (internal quotation marks omitted); *see also Jordan v. Mosley,* 487 F.3d 1350, 1355 (11th Cir. 2007); *Kingsland v. City of Miami*, 382 F.3d 1220, 1226 (11th Cir. 2004); *United States v. Gordon*, 231 F.3d 750, 758 (11th Cir. 2000), *cert. denied*, 531 U.S. 1200 (2001); *United States v. Allison,* 953 F.2d 1346, 1349-50 (11th Cir. 1992). It "is a fluid concept—turning on the assessment of probabilities in particular factual contexts" and, thus, "the usefulness of an informant's tips" must also be evaluated, not pursuant to rigid rules, but in light of the totality of the circumstances, according due weight to such "relevant considerations" as the individual's

veracity and basis of knowledge. *United States v. Brundidge*, 170 F.3d 1350, 1352-53 (11th Cir. 1999) (per curiam) (internal quotation marks omitted); *see also United States v. King*, No. 06-15655, 2007 WL 1544830, at *1 (11th Cir. May 30, 2007) (per curiam).

Despite Defendant's claim that inaudible audio "recordings formed the basis for [his] arrest," Motion at 5; *see also id.* at 1 ("The basis for Mr. Baez' arrest was a series of audio recordings[.]"), the government agent's unrefuted testimony establishes there was a great deal of other information supplying probable cause to arrest Mr. Baez.[2]  Both Mr. Sitz and Mr. Dampier supplied copious information pertaining to a marijuana distribution conspiracy in which Defendant allegedly performed a key role. These accounts largely substantiated and reinforced each other. Moreover, numerous details were corroborated by law enforcement. Even the initial revelation by Mr. Dampier that Randall Sitz was a drug dealer came as no shock to investigators, who already had independent information of that fact.  The precise description of the pickup truck with a secret compartment was impressively corroborated.  Drugs were in fact recovered, bricks shaped in such a manner that they could fit into the concealed space.  The use of a modified gaff hook had been accurately described by Mr. Dampier.

---

[2]     The recordings were not introduced into evidence, and the Court will confine its analysis to whether probable cause existed apart from whatever the recordings may have contributed.

Mr. Sitz's statements about what motel Defendant had recently used were verified by the investigation.  Physical descriptions of the assumed "mule" were corroborated.  Surveillance confirmed the existence of meetings between Defendant and Mr. Sitz.

No specific reason for doubting Mr. Sitz's trustworthiness has been alleged, and his reliability was evidenced by the officers' corroborating observations.  Further, the bases of knowledge for both individuals are strong and direct.  The potential difficulty with Mr. Dampier's usefulness as a source is the discovery that he had downplayed the extent of his own distribution activities and his initial denial that he possessed a large sum of money.  How much of this had been learned prior to Defendant's arrest is not clear.  Still, assuming agents had some cause to question his veracity, they were not thereby required to simply disregard the wealth of data he had provided.  As outlined above, much of it was corroborated by investigators and reinforced by Mr. Sitz.  The statements of these individuals, together with the corroborating facts gleaned by investigation and the observations of law enforcement, painted a coherent picture of a criminal conspiracy in which Defendant willingly participated.  Taken as a whole, the information of which agents were cognizant at the time of Mr. Baez's arrest established probable cause that he had committed a

felony.[3]    Accordingly,  the  warrantless  arrest  of  Defendant  was

justified.

### V. RECOMMENDATION

Based  on  the  foregoing,  it  is  recommended  the  Motion  (Doc.

#36) be **DENIED.**

**ENTERED** at Jacksonville, Florida, this 27th day of August,

2007.


<u>**/s/**       Howard T. Snyder</u>
HOWARD  T.  SNYDER
UNITED  STATES  MAGISTRATE  JUDGE




Copies to:

The Honorable Timothy J. Corrigan
United States District Judge

Counsel of Record
      and pro se parties, if any

---

[3]     During cross-examination of the witness, it was implied that probable cause might necessarily have been lacking due to law enforcement not directly observing illegal behavior.  *See* Tr. at 73-75.  Nevertheless, it is observed probable cause may be supplied by circumstantial evidence.  *See, e.g., United States v. Burgess*, 33 F. App'x 386, 388-89 (10th Cir. 2002); *United States v. Torres*, 1995 WL 600668, at *2 (6th Cir. Oct. 11, 1995) (Table); *cf. United States v. Harrington*, 204 F. App'x 784, 788 (11th Cir. 2006) (per curiam).